UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------X

GWENDOLYN CHAMBERS,            :

                           :

                Plaintiff,     :

                           :

      - against -        :

                           :

COMMISSIONER OF SOCIAL SECURITY,   :

                           :

              Defendant.   :

-------------------------------------------------------------X

19 Civ. 2145 (RWL)

**DECISION & ORDER:**
**<u>SOCIAL SECURITY APPEAL</u>**

**ROBERT W. LEHRBURGER, United States Magistrate Judge.**

Plaintiff Gwendolyn Chambers ("Chambers" or "Plaintiff"), represented by counsel, commenced the instant action against Defendant Andrew Saul, Acting Commissioner of the Social Security Administration (the "Commissioner") pursuant to the Social Security Act (the "Act"), 42 U.S.C. § 405(g), seeking review of the Commissioner's decision that Chambers is not entitled to supplemental security income ("SSI") under 42 U.S.C. § 423 et seq.  The parties have filed cross-motions for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c).  For the reasons stated below, Chambers' motion is GRANTED, the Commissioner's is DENIED, and the case is REMANDED.

**Background**

**A.    Procedural History**

On September 2, 2014, Chambers filed an application for SSI, alleging disability beginning January 2, 2009, due to sarcoidosis,[1] back pain, and a lung disorder.[2]  (R. 61, 73.[3])  The claim was denied on February 2, 2015, and reconsideration was denied on September 9, 2015.  (R. 73, 91.)  After a hearing on June 20, 2017, (R. 27-60), Administrative Law Judge ("ALJ") Laura Michalec Olszewski issued a decision on March 8, 2018, finding that Chambers was not disabled under the Act.  (R. 10-22.)  The Appeals Council denied review on January 9, 2019, making the ALJ's decision the final agency decision.  (R. 1.)

Chambers filed this action on March 8, 2019.  On March 11, 2019, the Honorable Jesse M. Furman, U.S.D.J., referred the matter for a Report and Recommendation. (Dkt. 7.)  On October 7, 2019, the parties consented to this Court's jurisdiction for all purposes.  (Dkt. 16.)

---

[1] Sarcoidosis is "a disease characterized by the growth of tiny collections of inflammatory cells (granulomas) in any part of [the] body – most commonly the lungs and lymph nodes. But it can also affect the eyes, skin, heart and other organs.  The cause of sarcoidosis is unknown, but experts think it results from the body's immune system responding to an unknown substance."  *Sarcoidosis*, Mayo Clinic, https:// www.mayoclinic.org/diseases-conditions/sarcoidosis/symptoms-causes/syc-20350358 (last visited September 15, 2020).  Symptoms include, among others, fatigue, shortness of breath, persistent dry cough, and pain and swelling in the joints.  Mayo Clinic, *supra*.

[2] At the administrative law hearing described further below, Plaintiff's counsel moved to amend the alleged onset date to September 2, 2014.  (R. 56-57.)  The record does not include any formal action on that motion, but the ALJ framed her conclusion in terms of whether Chambers was "under a disability . . . since September 2, 2014," and neither party has disputed the relevant period.  (R. 11.)

[3] R. refers to the Administrative Record.

The period at issue runs from September 2, 2014, the date Chambers applied for SSI benefits, through March 8, 2018, the date of the ALJ's decision.[4]

**B.      Plaintiff's Hearing Testimony and Self-Evaluation**

Born in 1964, (R. 160), Chambers was between fifty and fifty-three years old during the period at issue.  She completed high school and some college.  (R. 32).

Chambers explained that she had tried to work but that, "When I get a job, the coughing, people look at me like I have tuberculosis or something.  I get very fatigued, I get really tired, I start calling in."  (R. 44.)  During the period at issue, Chambers held two temporary jobs.  Her last job was in December 2016, when she worked as an expeditor at Macy's during the Christmas holiday two to three days per week for four to six hours per day.  (R. 35).  As an expeditor, she transported shoes from the back of the store to the shoe department.  (R. 35).  Through a temp-agency, Chambers worked full time in 2015 for approximately two months at Campbell Soup.  (R. 36).  Her job involved watching soup cans go down a conveyor belt and ensuring that they were not stuck.  (R. 36).  Chambers stopped working at Campbell Soup because of fatigue, back pain, and coughing.  (R. 47-48.)  She "just couldn't do it anymore," calling in sick due to fatigue, coughing, and back pain.  (R. 47-48.)  Years before that, in 2011, she worked as a hairdresser at a beauty salon.  (R. 36-37.)

---

[4] *See* 20 C.F.R. § 416.335 (the earliest month for which SSI benefits are payable is the month following the month an individual files an application for benefits); *Frye ex rel A.O. v. Astrue*, 485 F. App'x 484, 485 n.1 (2d Cir. 2012) ("The relevant period . . . is [from] the date the SSI application was filed, to . . . the date of the ALJ's decision.").

In May 2015, Chambers completed a function report in which she reported that she could manage her personal care and cook her own meals daily.  (R. 197-98.)  She reported driving a car, and shopping in stores once per month for groceries.  (R.199.)

Chambers testified at the June 2017 hearing that about one year prior to the hearing, her children took her on a seven-day cruise to Puerto Rico, St. Thomas, and Turks and Caicos.  (R. 39.)  While on the boat she "sat around and laughed" and watched comedy shows and performances.  (R. 40.)  She did not go on any excursions. (R. 39.)

Chambers testified that she lived on the first floor of a house with her cousin and the cousin's son, who supported her.  (R. 33-34.)  On a typical day, she slept "on and off" all day, dozing off due to fatigue and having no energy.  (R. 40, 49.)  In contrast to what she reported two years earlier, Chambers testified that she did not cook or even help with things around the house.  (R. 40-41.)  She used public transportation two or three times per month; otherwise, her cousin drove her, and she also used a car service provided by Medicaid.  (R. 34, 43.)

She liked to shop at Fulton Street in Brooklyn but could only go into one or two stores before returning to the car to sit.  (R. 42, 49-50.)  Every Sunday, she walked to church services down the block from where she lived.  (R. 43.)  Chambers reported that she would sit through the whole service, which lasted approximately one hour and forty-five minutes.  (R. 51.)  Once per month, Chambers had her nails done at a salon, for which she sat for approximately thirty minutes.  (R. 50-51.)  In addition, she spent time on social media and clothing websites.  (R. 41-42.)

Chambers testified that her sarcoidosis comes and goes.  (R. 46.)  As of the hearing, she had been symptomatic for the previous two years, experiencing coughing, rashes, and fatigue.  (R. 46.)  Before coming to New York in September or October 2016, Chambers lived in North Carolina.  While there, she did not treat her sarcoidosis because she did not have Medicaid and could not get treatment other than getting dosage packs of steroids.  (R. 44-45.)  Asked why, when she moved to New York, she did not receive any treatment for six to eight months, Chambers testified that she had to wait to see a pulmonologist.  (R. 44-45).

Chambers also testified that she had back pain "all the time."  (R. 47.)  She rated her pain as eight out of ten.  (R. 47.)  She did not take medication for her back but did get cortisone shots (among other treatments).  She could walk for approximately twenty minutes before needing to stop, and stand for approximately half an hour before needing to sit.  (R. 48.)  She could lift up to ten to fifteen pounds.  (R. 48.)  She testified that she could not sit for too long before needing to stand due to back pain, and that the ALJ hearing was the longest she had sat in a long time.  (R. 48.)  She "normally" lay down because her back hurt or had pillows propped up behind her.  (R. 48.)

The hearing transcript suggests that Chambers experienced a coughing episode during the hearing; she did not ask for any medical attention.  (R. 41-42.)

## C.   Relevant Medical History

Pursuant to this Court's supplemental standing order issued on April 30, 2019, the Commissioner was required to direct the Court to any inaccuracies in Chambers' summary of the record in "a footnote or section that lists each such statement," that "explains why each such statement is inaccurate, and includes supporting cites to the

record." (Dkt. 8, ¶ 8b.)   While providing its own summary of the record, the Commissioner's brief did not include any such footnote or section identifying inaccuracies in Chambers' summary of the record.   Instead, both Chambers and the Commissioner have emphasized different facts.   Accordingly, the Court incorporates by reference both Chambers' and the Commissioner's summaries of the underlying facts and medical records.   In any event, the Court has independently reviewed the record.

In brief sum, during the disability period,[5] Chambers experienced repeated bouts of coughing, rashes, fatigue, and other afflictions related to her sarcoidosis.   She also suffered sciatica, lower back pain, and pain radiating down her right leg, for which she was treated with cortisone shots, medication, and other methods.   At times, medical tests or evaluations showed unremarkable results.   (*E.g.*, R. 249 (June 2015 lumbar x-ray), 330 (May 2016 chest x-ray), 556-67 (Oct. 2016 physical exam).)   But during 2015, 2016, and 2017, she went to the emergency room at least twenty-two times variously for headaches, hives and rashes, shortness of breath, abdominal pain, and back pain. (*See e.g.*, R. 46, 294, 312, 323, 338, 344, 357, 385, 392, 405, 427, 443, 467, 613, 621.) Chambers was prescribed an array of medications for pain, rashes, and congestion, including, at varying times, Ativan, Augmentin, Benadryl, Catapres, Cipro, Decadron, Fioricet, Flexeril, guaifenesin, ibuprofen, meclizine, Mobic, Pyridium, Solu-Medrol, Toradol, Ventolin, Vistaril, and Zofran.   She also was prescribed a back brace.   (R. 285, 561.)

---

[5] The record includes medical records from prior to the disability period, including from as early as 2008, which the Court has taken into account, even if not discussed above.

From November 2016 to April 2017, Chambers saw a pain management doctor, Matthew Lefkowitz, M.D., on at least five occasions for treatment of her back pain. Dr. Lefkowitz assessed lumbosacral spondylosis.[6] (R. 285.) Due to the limited efficacy of conservative therapy such as ibuprofen and exercises, Dr. Lefkowitz administered a lidocaine injection and/or nerve block injection to Chambers' spine on at least four occasions, which provided only temporary relief for a week or two. (*See* R. 282, 286, 545, 547.) Otherwise, Chambers reported persistent pain of seven or eight out of ten, although she reported moderate relief with home exercise, pain medication (Mobic and ibuprofen), and a muscle relaxant (Flexeril). (R. 284, 543, 546, 548.) In examining Chambers, Dr. Lefkowitz repeatedly observed an antalgic gait,[7] pain on palpation in the lumbar area, and pain with limited motion. (R. 282, 285, 544, 547.)

## D. Medical Opinion Evidence

During the period at issue, three doctors provided medical source opinions about Chambers' physical functioning and limitations: an examining consultative physician, a non-examining consultative physician, and Dr. Lefkowitz.[8]

---

[6] Spondylosis is defined as "noninflammatory degenerative disease of the spine resulting in abnormal bone development around the vertebrae and reduced mobility of the intervertebral joints." *Powell v. Berryhill*, No. 17 Civ. 8922, 2019 WL 2553641, at *2 n.4 (S.D.N.Y. Feb. 25, 2019) (quoting *Spondylosis*, Encyclopedia Britannica, https://www.britannica.com/science/spondylosis (last visited Sept. 15, 2020)).

[7] "An antalgic gait is one in which the stance phase of walking is shortened on one side due to pain on weight bearing." *Rodriguez v. Astrue*, No. 02 Civ. 1488, 2009 WL 1619637, at *6 n.23 (S.D.N.Y. May 15, 2009).

[8] Well before the covered period, in 2008, Chambers was examined by a consultative physician, Dr. Ferris Locklear. (R. 222-27.) The ALJ recognized the staleness of Dr. Locklear's findings and opinion and observed that Dr. Locklear did not provide a comprehensive functional analysis. (R. 19.) The ALJ accordingly assigned Dr.

### 1.  Peter Morris, M.D. (Examining Consultative Physician)

On June 27, 2015, consultative physician Dr. Peter Morris examined Chambers. (R. 250-56.)  Dr. Morris observed that Chambers ambulated without assistance, could get on and off the examination table, and sat comfortably during the examination.  (R. 253.)  Chambers' lungs were clear and normal.  (R. 253.)  Chambers' gait was moderately slow and antalgic; she had moderate difficulty with heal, toe, and tandem walking; and she would not try squatting or kneeling or bending over to tie her shoes. (R. 253-255).  In Dr. Morris' opinion, Chambers did not make a good effort.  (R. 253.)

A Romberg test was negative.[9]  (R. 254).  Range of motion of the cervical spine was zero to fifty degrees forward flexion, zero to sixty degrees extension, zero to forty-five degrees lateral flexion, and zero to eighty degrees bilaterally.  (R. 254.)  Range of motion of the lumbar spine was thirty degrees forward flexion, and zero degrees extension with, in Dr. Morris' view, poor effort.  (R. 254.)  Chambers was unwilling to try lateral flexion or rotation because she stated it caused her too much pain.  (R. 254.) Range of motion of the hips was thirty degrees flexion, ten degrees extension, twenty degrees abduction, ten degrees adduction, twenty degrees internal rotation, and twenty-five degrees external rotation, with, again in Dr. Morris' view, "obviously poor effort."  (R.

---

Locklear's opinion little weight.  (R. 19.)  The parties do not raise any dispute with regard to the ALJ's assessment of Dr. Locklear's opinion.  The Court finds no error in that assessment and does not address it further.

[9] A Romberg test is given to diagnose sensory imbalance or gait disturbances. *See Millett v. Berryhill*, No. 17 Civ. 7295, 2019 WL 2453344, at *15 n.53 (S.D.N.Y. Jan. 11, 2019) ("The Romberg test is used to diagnose sensory ataxia a gait disturbance caused by abnormal perception of where the body is in space – and is performed by having the patient stand upright and close his eyes. A loss of balance is interpreted as a positive Romberg sign.") (citing *Romberg Test*, Physiopedia, https://www.physio-pedia.com/ Romberg_Test (last visited Sept. 15, 2020)).

254.)   Straight leg raise test was negative.   (R. 254-55.)   Chambers had some tenderness to palpation along the lumbar spine, but no muscle spasm, trigger points, or deformities were observed.  (R. 255.)  Dr. Morris assessed full muscle strength in the upper extremities, 4/5 strength in the lower extremities, and grossly intact sensation. (R. 255.)

Dr. Morris diagnosed sarcoidosis with a report of significant dyspnea (i.e., shortness of breath) and chronic lower back pain, with symptoms of right lower radiculopathy.[10]  (R. 255.)  He assessed Chambers' maximum standing capacity as six hours, and her maximum walking capacity as four hours due to her slow antalgic gait, decreased strength in lower extremities, decreased range of motion, and back pain.  (R. 255.)  He opined that Chambers could lift, carry, push, and pull a maximum of twenty pounds occasionally and ten pounds frequently, due to her moderate difficulty with heel/toe walking, her lower back pain, and decreased motor strength.  (R. 255.)  Dr. Morris assessed that Chambers could occasionally perform postural activities such as balancing, stooping, kneeling, crouching, crawling, and climbing stairs, but could never climb ladders or scaffolds.  (R. 256.)  He noted the difficulty of estimating those abilities due to Chambers' apparent unwillingness to try any postural movements.  (R. 256.)  He opined that Chambers could perform manipulative activities such as reaching overhead or forward frequently, and could handle, finger, and feel without limitation.  (R. 256).  Dr.

---

[10] "Radiculopathy describes a range of symptoms produced by the pinching of a nerve root in the spinal column.  The pinched nerve can occur at different areas along the spine (cervical, thoracic or lumbar).  Symptoms of radiculopathy vary by location but frequently include pain, weakness, numbness and tingling." *Radiculpathy*, Johns Hopkins Medicine, https://www.hopkinsmedicine.org/health/conditions-and-diseases/ radiculopathy (last visited September 16, 2020).

Morris indicated that Chambers should not work at heights due to her gait, and stated that she should avoid working around dust, fumes, and gases due to her sarcoidosis. (R. 256.)

### 2.  Rudolf Titanji, M.D. (Non-examining Consultative Physician)

On September 8, 2015, internist Rudolf Titanji – a state agency consultant – reviewed the medical evidence of record and assessed Chambers' residual functional capacity.  (R. 80-81, 84-86, 90.)  He opined that Chambers could stand and/or walk for about six hours, and sit for about six hours, in an eight-hour day.  (R. 84.)  He further opined that Chambers could lift and carry ten pounds frequently and twenty pounds occasionally.   (R. 84.)   Dr. Titanji assessed that Chambers could frequently kneel, balance, and crouch, and could occasionally stoop, crawl, and climb ramps, stairs, ladders, ropes, and scaffolds.  (R. 85.)  He advised that Chambers be restricted from concentrated exposure to fumes, odors, dusts, gases, and poor ventilation.  (R. 85.)

### 3.  Martin Lefkowitz, M.D. (Treating Physician)

On June 19, 2017 – the day before the administrative hearing – Chambers' treating pain management doctor, Dr. Lefkowitz, completed a "Physical Assessment" form.  (R. 886-88.)  Dr. Lefkowitz provided a diagnosis of lumbar spondylosis.  (R. 887.) Dr. Lefkowitz checked "often" to indicate how often Chambers' impairments interfered with her attention and ability to concentrate.  (R. 887.)  He checked "yes," indicating that Chambers would need to recline or lie down during a workday in excess of typical breaks.  (R. 887.)  He assessed that Chambers could walk two blocks without rest or significant pain, could sit for five hours in an eight-hour workday, and could "stand/walk" for two hours in an eight-hour workday.   (R. 887.)   Dr. Lefkowitz checked "yes" to

indicate that Chambers would need to take unscheduled breaks during a workday.  (R. 887.)   He indicated Chambers could occasionally lift and carry ten pounds and frequently lift and carry less than ten pounds.   (R. 887.)   He also indicated that Chambers had no limitations in reaching, handling, or fingering.  (R. 887.) He checked "Once or twice a month" in response to the question "how often [is] your patient . . . likely to be absent from work as a result of their impairments or treatments."  (R. 888.)

## E.   Vocational Expert Testimony

At the hearing, Alita Coles, a vocational expert, testified about potentially available jobs.  (R. 53.)  The ALJ asked Coles to assume an individual of Plaintiff's age, education, and work experience who could do light work but was limited to no kneeling, crouching, crawling, or climbing ladders or scaffolds, and only occasional climbing of ramps and stairs and exposure to respiratory irritants.[11]   (R. 55-57.)   Regarding Chambers' past work, Coles testified that such an individual could not work as a shampooer due to the chemicals, but could work at a "group home or case aide."  (R. 57.)  Such a person also could perform the jobs of children's attendant, fundraiser, and information clerk.  (R. 57.)   According to Coles, in the national economy there were 114,000 children's attendant jobs, 868,580 fundraiser jobs, and 975,890 information clerk jobs.  (R. 57.)  However, a person with the functional abilities and limitations posed

---

[11] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  To be considered capable of performing a full or wide range of light work, [the claimant] must have the ability to do substantially all of these activities."  20 C.F.R. § 416.967(b).

in the hypothetical could not work at those jobs if she were off task more than nine percent of the time or if she consistently missed work one day per month.  (R. 57-58.)

**F.    The ALJ's Decision**

The ALJ rendered her decision on March 8, 2018, following the requisite five-step sequential analysis described further below.  At step one, the ALJ found that Chambers had not engaged in substantial gainful activity since September 2, 2014.  (R. 12.)  At step two, the ALJ found that Chambers had the following severe impairments: sarcoidosis, degenerative disc disease, sleep apnea, and obesity.[12]  (R. 13.)  At step three, the ALJ determined that none of Chambers' severe impairments separately or together met or medically equaled the severity of a "listed" impairment that would automatically qualify as disabling.  (R. 14-15.)

The ALJ next determined Chambers' residual functional capacity ("RFC"), finding that Chambers could perform light work but could not kneel, crouch, crawl, or climb ladders or scaffolds; and could only occasionally climb ramps and stairs and be exposed to respiratory irritants and temperature extremes.  (R. 15.)  In reaching that assessment, the ALJ found Chambers' statements about the intensity, persistence, and limiting effects of her symptoms to be inconsistent with the medical evidence and her testimony about her activities of daily living.  (R. 16.)  The ALJ also considered the medical opinions in the record, assigning "great weight" to the opinions of consulting physician Dr. Morris (who examined Chambers once) and Dr. Titanji (who reviewed the

---

[12] About four months before the hearing, Chambers was 5'2" tall and weighed 192 pounds.  (R. 17.)

paper record), but "little weight" to the opinion of Chambers' treating doctor, Dr. Lefkowitz.  (R. 18-19.)

At step four of the analysis, the ALJ found that Chambers could perform past relevant work as a shampooer – even though the vocational expert had ruled that job out due to use of chemicals.  (R. 20, 57.)  Alternatively, at step five, the ALJ found that Chambers could successfully adjust to work as a children's attendant, fundraiser, or information clerk.  (R. 20-21.)  The ALJ therefore determined Chambers not disabled, as defined by the Act, during the relevant period.[13]  (R. 21.)

## Applicable Law

### A.    Standard of Review

A United States District Court may affirm, modify, or reverse (with or without remand) a final decision of the Commissioner of Social Security.  42 U.S.C. § 405(g); *Skrodzki v. Commissioner of Social Security, Administration*, 693 F. App'x 29, 29 (2d Cir. 2017) (summary order).  The inquiry is "whether the correct legal standards were applied and whether substantial evidence supports the decision."  *Butts v. Barnhart*, 388

---

[13] In her decision, the ALJ addressed Chambers' mental health as well as her physical health.  The ALJ thus acknowledged that Chambers had medically determinable impairments of anxiety and depression.  (R.13.)  The record includes several consultative opinions about Chambers' mental health and functioning.  (R. 63, 65, 67, 70, 82.)  The ALJ ultimately found that Chambers had no more than mild limitations in any relevant mental functional area.  (R. 13-14.)  Consistent with that determination, the ALJ's RFC did not include any mental impairment limitations, and the parties do not present any dispute about the ALJ's decision with respect to mental health issues.  The Court therefore does not address mental health issues in this decision.  Nonetheless, having reviewed the record, the Court finds that the ALJ's determinations regarding Chambers' mental health impairments and functioning are supported by substantial evidence.

F.3d 377, 384 (2d Cir. 2004); *see also Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012).

"Failure to apply the correct legal standard constitutes reversible error, including, in certain circumstances, failure to adhere to the applicable regulations."   *Douglass v. Astrue*, 496 F. App'x 154, 156 (2d Cir. 2012) (summary order) (quoting *Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir. 2008) (internal citations omitted)); *Kohler*, 546 F.3d at 265-69 (remanding for noncompliance with regulation, which resulted in incomplete factual findings).   Courts "review[] *de novo* whether the correct legal principles were applied and whether the legal conclusions made by the ALJ were based on those principles." *Thomas v. Astrue*, 674 F. Supp. 2d 507, 520, 530 (S.D.N.Y. 2009) (reversing for legal error after de novo consideration); *see Acierno v. Barnhart*, 475 F.3d 77, 80-81 (2d Cir. 2007) ("We review the administrative record *de novo* to determine whether there is substantial evidence supporting the Commissioner's decision and whether the Commissioner applied the correct legal standard" (quoting *Pollard v. Halter*, 377 F.3d 183, 188 (2d Cir. 2004))); *Johnson v. Bowen*, 817 F.2d 983, 985-86 (2d Cir. 1987) (reversing where the court could not "ascertain whether [the ALJ] applied the correct legal principles . . . in assessing [the plaintiff's] eligibility for disability benefits"); *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984) (reversing where the Commissioner's decision "was not in conformity with the regulations promulgated under the Social Security Act").

If the reviewing court is satisfied that the ALJ applied correct legal standards, then the court must "conduct a plenary review of the administrative record to determine if there is substantial evidence, considering the record as a whole, to support the

Commissioner's decision." *Brault v. Social Security Administration, Commissioner*, 683 F.3d 443, 447 (2d Cir. 2012) (per curiam) (quoting *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir. 2009)).   Substantial evidence is defined as "more than a mere scintilla.   It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."   *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998) (quoting *Richardson v. Perales*, 402 U.S. 398, 401 (1971)); *see also Biestek v. Berryhill*, __ U.S. __, __, 139 S. Ct. 1148, 1154 (2019) (reaffirming same standard).   "The substantial evidence standard means once an ALJ finds facts, [the court] can reject those facts 'only if a reasonable factfinder would have to conclude otherwise.'"   *Brault*, 683 F.3d at 448 (quoting *Warren v. Shalala*, 29 F.3d 1287, 1290 (8th Cir. 1994)); *see also* 42 U.S.C. § 405(g) ("[F]indings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive.").

To be supported by substantial evidence, the ALJ's decision must be based on consideration of "all evidence available in [the claimant]'s case record."   42 U.S.C. § 423(d)(5)(B).   The Act requires the ALJ to set forth "a discussion of the evidence" and the "reasons upon which [the decision] is based."   42 U.S.C. § 405(b)(1).   While the ALJ's decision need not "mention[] every item of testimony presented," *Mongeur v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983) (per curiam), or "reconcile explicitly every conflicting shred of medical testimony," *Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir. 2010) (quoting *Fiorello v. Heckler*, 725 F.2d 174, 176 (2d Cir. 1983)), the ALJ may not ignore or mischaracterize evidence of a person's alleged disability, *see Ericksson v. Commissioner of Social Security*, 557 F.3d 79, 82-84 (2d Cir. 2009) (mischaracterizing evidence); *Kohler*, 546 F.3d at 268-69 (overlooking and mischaracterizing evidence);

*Ruiz v. Barnhart*, No. 01 Civ. 1120, 2002 WL 826812, at *6 (S.D.N.Y. May 1, 2002) (ignoring evidence).

Where evidence is deemed susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld. *See Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982). The court must afford the Commissioner's determination considerable deference and may not substitute "its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a de novo review." *Valente v. Secretary of Health and Human Services*, 733 F.2d 1037, 1041 (2d Cir. 1984); *Dunston v. Commissioner of Social Security,* No. 14 Civ. 3859, 2015 WL 54169, at *4 (S.D.N.Y. Jan. 5, 2015) (quoting *Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir. 1991)), *R. & R. adopted*, 2015 WL 1514837 (S.D.N.Y. April 2, 2015). Accordingly, if a court finds that there is substantial evidence supporting the Commissioner's decision, the court must uphold the decision, even if there is also substantial evidence for the plaintiff's position. *Genier v. Astrue*, 606 F.3d 46, 49 (2d. Cir. 2010). The court, however, will not defer to the Commissioner's determination if it is "the product of legal error." *Dunston*, 2015 WL 54169, at *4 (quoting *Duvergel v. Apfel*, No. 99 Civ. 4614, 2000 WL 328593, at *7 (S.D.N.Y. Mar.29, 2000)) (citing, *inter alia, Douglass*, 496 F. App'x at 156; *Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999)).

**B.    Legal Principles Applicable to Social Security Determinations**

Under the Social Security Act, every individual considered to have a "disability" is entitled to disability insurance benefits. 42 U.S.C. § 423(a)(1). The Act defines disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result

in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A claimant's impairments must be "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

To determine whether an individual is disabled entitling them to benefits, the Commissioner conducts a five-step inquiry. 20 C.F.R. § 416.920. First, the Commissioner must determine whether the claimant is currently engaged in any substantial gainful activity. 20 C.F.R. § 416.920(a)(4)(i). Second, if the claimant is not gainfully engaged in any activity, the Commissioner must determine whether the claimant has a "severe" impairment that significantly limits the claimant's ability to do basic work activities. 20 C.F.R. § 416.920(a)(4)(ii). Under the applicable regulations, an impairment or combination of impairments that significantly limits the claimant's ability to perform basic work activities is considered "severe." 20 C.F.R. § 416.920(c). Third, if the claimant has a severe impairment, the Commissioner must determine whether the impairment is, or medically equals, one of those included in the "listings" of the regulations contained at 20 C.F.R. Part 404, Subpart P, Appendix 1. If it is, the Commissioner will presume the claimant to be disabled, and the claimant will be eligible for benefits. 20 C.F.R. § 416.920(a)(4)(iii).

If the claimant does not meet the criteria for being presumed disabled, then the Commissioner must next assess the claimant's RFC – that is, the claimant's ability to perform physical and mental work activities on a sustained basis despite his or her impairments, 20 C.F.R. § 416.920(e) – and determine whether the claimant possesses

the RFC to perform the claimant's past work.  20 C.F.R. § 416.920(a)(4)(iv).  Fifth and finally, if the claimant is not capable of performing prior work, the Commissioner must determine whether the claimant is capable of performing other available work.  20 C.F.R. § 416.920(a)(4)(v).  The claimant bears the burden of proof at the first four steps. *Selian v. Astrue*, 708 F.3d 409, 418 (2d Cir. 2013).  Once the claimant has established that they are unable to perform their past work, however, the Commissioner bears the burden of showing that "there is other gainful work in the national economy which the claimant could perform."  *Balsamo v. Chater*, 142 F.3d 75, 80 (2d Cir. 1998) (quoting *Carroll v. Secretary of Health and Human Services*, 705 F.2d 638, 642 (2d Cir. 1983)).

## Discussion

Chambers challenges two aspects of the ALJ's decision.  First, she argues that the ALJ erred by assigning little weight to the opinion of Chambers' treating physician, Dr. Lefkowitz, and assigning great weight to the non-treating physicians, Dr. Morris and Dr. Titanji.  Second, she argues that the ALJ improperly discounted her complaints about the extent and severity of her symptoms.  The Commissioner opposes, arguing that the ALJ's decision is supported by substantial evidence.  As discussed below, Chambers is correct; the ALJ erred in her weighing of the medical opinions and, for similar reasons, erred with respect to evaluating Chambers' complaints about her symptoms.  Remand is required for a correct analysis.

## A.     The ALJ Erred in Weighing the Medical Opinions

In making his RFC determination, the ALJ ascribed only little weight to the opinion of Dr. Lefkowitz, Chambers' treating physician, while assigning great weight to the two consultative doctors.  The ALJ erred in doing so.

### 1.  The Treating Physician Rule

An ALJ must evaluate every medical opinion received.  *Rodriguez v. Colvin*, No. 12 Civ. 3931, 2014 WL 5038410, at *17 (S.D.N.Y. Sept. 29, 2014).   A treating physician's opinion will be given controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record."  20 C.F.R. § 416.927(c)(2); *see also Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008).   Conversely, an ALJ is not required to assign a treating physician's opinion controlling weight when it is contradicted by substantial evidence in the record.  *Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002) (noting that a treating physician's opinion is not controlling when contradicted "by other substantial evidence in the record").[14]

When an ALJ gives a treating physician's opinion less than controlling weight, the ALJ must give "good reasons" for doing so.  20 C.F.R. § 416.927(c)(2) (stating that the agency "will always give good reasons in our notice of determination or decision for the weight we give [the claimant's] treating source's medical opinion"); *Snell v. Apfel*, 177

---

[14] The regulations for evaluating medical opinions were amended in 2017, but the changes are only applicable to claims filed on or after March 27, 2017.  *See* 20 C.F.R. §§ 404.1527, 404.1520c; *Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 Fed. Reg. 5844-01, 2017 WL 168819, at *5844, *5867-68 (Jan. 18, 2017).  Because Chambers' claim was filed before that date, the Court applies the earlier regulations.

F.3d 128, 133 (2d Cir. 1999); *Schaal*, 134 F.3d at 505.  "Failure to provide 'good reasons' for not crediting the opinion of a claimant's treating physician is a ground for remand."  *Snell*, 177 F.3d at 133; *see also Schaal*, 134 F.3d at 505 ("Commissioner's failure to provide 'good reasons' for apparently affording no weight to the opinion of plaintiff's treating physician constituted legal error.").

If the ALJ decides not to give controlling weight to a treating physician's opinion, the ALJ must then consider several factors to determine what weight it should receive: (1) the length of the treatment relationship and the frequency of examination, (2) the nature and extent of the treatment relationship, (3) the medical support for the treating physician's opinion, (4) the consistency of the opinion with the record as a whole, (5) whether and to what extent the physician is a specialist in the area covering the particular medical issues, and (6) other factors that tend to support or contradict the opinion.  20 C.F.R. § 416.927(c)(2)-(6); *Greek v. Colvin*, 802 F.3d 370, 375 (2d Cir. 2015); *Selian*, 708 F.3d at 418.  After considering those factors, the ALJ must "comprehensively set forth [her] reasons for the weight assigned to a treating physician's opinion."  *Halloran v. Barnhart*, 362 F.3d 28, 33 (2d Cir. 2004).

A "slavish recitation of each and every factor," however, is unnecessary "where the ALJ's reasoning and adherence to the regulation are clear."  *Atwater v. Astrue*, 512 F. App'x 67, 70 (2d Cir. 2013) (summary order).  Thus, an "application of the treating physician rule is sufficient when the ALJ provides 'good reasons' for discounting a treating physician's opinion that reflect in substance the factors as set forth in [the regulation], even though the ALJ declines to examine the factors with explicit reference

to the regulation." *Crowell v. Commissioner*, 705 F. App'x 34, 35 (2d Cir. 2017) (summary order) (citing *Halloran*, 362 F.3d at 32-33).

"The same factors also must be considered with respect to what weight to give non-treating doctors, 'with the consideration of whether the source examined the claimant or not replacing the consideration of the treatment relationship between the source and the claimant.'" *McGinley v. Berryhill*, No. 17 Civ. 2182, 2018 WL 4212037, at *12 (S.D.N.Y. July 30, 2018) (quoting *Butts v. Commissioner of Social Security*, No. 16 CV 874, 2018 WL 387893, at *6 (N.D.N.Y. Jan. 11, 2018)), *R. & R. adopted*, 2018 WL 4211307 (S.D.N.Y. Sept. 4, 2018). Although the Second Circuit has cautioned that ALJs should not rely heavily on the findings of consultative physicians that arose from a single examination, *Cruz v. Sullivan*, 912 F.2d 8, 13 (2d Cir. 1990), a consultative physician's opinion may nonetheless constitute substantial evidence, *see Petrie v. Astrue*, 412 F. App'x 401, 406 (2d Cir. 2011) (affirming ALJ reliance on findings of two consultative examiners in declining to afford treating physicians controlling weight).

### 2. Analysis

To recap, the ALJ assigned weights to the three relevant medical source opinions as follows: "little weight" to the opinion of Dr. Lefkowitz who treated Chambers from November 2016 through at least April 2017; "great weight" to consultative physician Dr. Morris who examined Chambers once in June 2015; and "great weight" to consultative physician Dr. Titanji who reviewed the record in September 2015 without examining Chambers. Having assigned the opinion of Dr. Lefkowitz, the sole treating physician, less than controlling weight, the ALJ was required to provide "good reasons" for doing so. *Snell*, 177 F.3d at 133; *Schaal*, 134 F.3d at 505. She did not.

The ALJ set forth the totality of her explanation for affording Dr. Lefkowitz's opinion little weight in two sentences: "Dr. Lefkowitz's opinion . . . was inconsistent with the claimant's testimony and statements regarding her activities of daily living, and was inconsistent with the unremarkable clinical record including conservative treatment."  (R. 19.)  That's it.  The ALJ did not elaborate.

The ALJ's reasons do not stand up to scrutiny and hardly pass muster as "good."  First, the ALJ characterized Dr. Lefkowitz's opinion as inconsistent with Chambers' testimony regarding her daily activities.   The ALJ recited the following activities:  Claimant's attending church services for one and a half hours; walking to and from church; using public transportation two or three times per month; going on a seven-day cruise where she watched shows and plays and "went to the casinos"; and getting her nails done once per month for which she sits at least 30 minutes.  (R. 19.)  In the ALJ's view "[a]ctivities at this level are not consistent with an inability to perform any substantial gainful activity."  (R. 19.)

But in setting forth those activities, the ALJ omitted important information and thereby materially distorted the record.  *See Williams v. Colvin*, No. 13 Civ 5431, 2015 WL 1223789, at *8 (S.D.N.Y. March 17, 2015) ("Although the ALJ is not required to 'explicitly reconcile every conflicting shred of evidence in the record,' an ALJ 'cannot simply selectively choose evidence in the record that supports [her] conclusions.'" (quoting *Dioguardi v. Commissioner of Social Security*, 445 F. Supp. 2d 288, 297 (W.D.N.Y. 2006))).  The ALJ also mischaracterized as "inconsistent" activities that are fully consistent with Dr. Lefkowitz's opinion.  Both are grounds for remand.  *E.g., Ericksson*, 557 F.3d at 82-84 (mischaracterizing evidence); *Kohler*, 546 F.3d at 268-69

(overlooking and mischaracterizing evidence); *Ruiz*, No. 01 Civ. 1120, 2002 WL 826812, at *6 (ignoring evidence).

To begin, Chambers attended church services once per week.  (R. 43).  While one may reasonably infer that going to church services is a weekly event, the ALJ left out any mention of frequency.   Regardless, there is nothing inconsistent about Chambers sitting for one-and-a-half hours and Dr. Lefkowitz's opinion that Chambers could sit for up to five hours total in an eight-hour day and stand/walk no more than two hours per day, or that Chambers would need to take unscheduled breaks at work, or any of his other opinions.  (*See* R. 887-88.)

Similarly, while mentioning that Chambers walked to and from church, the ALJ did not mention that to do so Chambers merely had to walk one block.  (*See* R. 43.) There is nothing inconsistent about Chambers' ability to walk one block at a time once per week and Dr. Lefkowitz's opinion that Chambers could walk up to two blocks without rest or significant pain.  (*See* R. 887.)

The Court also fails to see how Chambers' taking public transportation two or three times per month is inconsistent with a disability to work.  *See Carroll*, 705 F.2d at 643 (fact that claimant engaged in various activities and rode buses and subway, without showing that claimant did so for sustained periods, was not substantial evidence to support ability to perform even sedentary work); *see generally Balsamo*, 142 F.3d at 81 ("We have stated on numerous occasions that 'a claimant need not be an invalid to be found disabled' under the Social Security Act." (quoting *Williams v. Bowen*, 859 F.2d 255, 260 (2d Cir. 1988))).

As for Chambers' having gone on a cruise, the ALJ's rendition of Chambers' activities fails to mention that her children took her on the cruise, assisted her while walking, and carried things for her, and that she did not go on any excursions. (*See* R. 39-40.)  Meanwhile, there is nothing inconsistent with Dr. Lefkowitz's opinions and Chambers' having gone to shows and performances while on the cruise (particularly as the ALJ did not inquire about the duration of the shows or whether Chambers switched positions during the shows).  And the ALJ was simply incorrect in stating that Chambers went to casinos – she affirmatively testified that she did not.  (R. 40.)

Finally, there is nothing inconsistent between Dr. Lefkowitz's opinions and the fact that Chambers had her nails done once per month for thirty minutes or so.  *See Murdaugh v. Secretary of Health and Human Services*, 837 F.2d 99, 102 (2d Cir. 1988) (reversing determination of no disability and observing "that appellant receives conservative treatment, waters his landlady's garden, occasionally visits friends and is able to get on and off an examination table can scarcely be said to controvert the medical evidence").

In short, none of the activities referenced by the ALJ are inconsistent with any of Dr. Lefkowitz's opinions, and the ALJ's stating otherwise without support is not a good reason for discounting Dr. Lefkowitz's opinions.

The second rationale advanced by the ALJ for affording only limited weight to Dr. Lefkowitz's opinion was that the opinion "was inconsistent with the unremarkable clinical record including conservative treatment."  (R. 19.)  Starting with the specific, the opinion of a treating physician may not be discounted merely because the doctor recommended and provided conservative treatment.  *See, e.g.*, *Burgess*, 537 F.3d at 129 ("Nor is the

24

opinion of the treating physician to be discounted merely because he has recommended a conservative treatment regimen."); *Shaw v. Chater*, 221 F.3d 126, 134 (2d Cir. 2000) (district court erred by ruling that the treating physician's "recommend[ation of] only conservative physical therapy, hot packs, EMG testing – not surgery or prescription drugs – [w]as substantial evidence that [the claimant] was not physically disabled"); *Nusraty v. Colvin*, 213 F. Supp. 3d 425, 440 (E.D.N.Y. 2016) ("The ALJ's reliance on her conclusion that Dr. Blacher's treatment of Plaintiff was conservative was not a proper basis to discount Dr. Blacher's opinion about Plaintiff's capacities and limitations.").

Moreover, the ALJ incorrectly characterized Chambers' course of treatment with Dr. Lefkowitz as conservative.   Dr. Lefkowitz's medical records do reference conservative treatment (such as taking ibuprofen, home exercises, and lifestyle modifications) (*e.g.*, R. 281, 284, 546), but that is in contrast to the treatment administered by Lefkowitz – namely, lidocaine injections and nerve blocks.  Indeed, Dr. Lefkowitz's notes from his first visit with Chambers expressly address the inefficacy of conservative treatment up to then: "Thus far pain has been unresponsive to greater than six months of conservative therapy including: medication management (ibuprofen), progressive home exercises, . . . [and] lifestyle modifications."  (R. 284.)  The ALJ got it exactly backwards.

As for inconsistency with the "unremarkable medical record," the ALJ's conclusory statement is baffling.   To the extent the record referred to is that documented by Dr. Lefkowitz, it can hardly be characterized as "unremarkable."  Again, Dr. Lefkowitz deemed it appropriate to administer spinal injections because other less

invasive measures were not working.  Meanwhile, the more aggressive treatment that he did administer proved not to have lasting efficacy.  At baseline – when Chambers first treated with Dr. Lefkowitz on November 29, 2016 – Chambers reported pain as constant and at a level of eight out of ten.  (R. 284.)  At a visit with Dr. Lefkowitz just over a month later, however, Chambers reported that although the injection initially provided eighty percent relief, it lasted only one week.  (R. 281.)  She again reported the pain as constant and eight out of ten.  (R. 281.)  Dr. Lefkowitz administered another injection, which provided eighty percent relief as soon as ten minutes post injection, (R. 283), but which Chambers reported lasting only two weeks, (R. 546).  And still, by at least April 26, 2017, Chambers reported her pain as constant, still an eight out of ten, and aggravated by prolonged walking.  (R. 543.)  That same day, Dr. Lefkowitz administered another set of injections, which reduced the pain to a one out of ten immediately following the procedure.  (R. 545.)  There are no records, however, indicating that Chambers received any lasting relief from those injections.[15]  The ALJ's statement that Chambers' follow-up examinations with Dr. Lefkowitz "revealed significant improvement" is yet another finding betrayed by the record.

---

[15] There are no records of any treatment with Dr. Lefkowitz after April 26, 2017.  On remand, the ALJ would do well to inquire into Chambers' pain management following the April 26, 2017 visit with Dr. Lefkowitz.  *See* 20 C.F.R. § 416.912(b) (ALJ's duty to develop the record).  That is particularly true here because Dr. Lefkowitz's April 26, 2017 notes state that if the injections administered that day did not have lasting efficacy, Chambers would be a candidate for a different procedure, specifically radiofrequency facet joint rhizotomy, which could be expected to extend functional gains for six to nine months.  (R. 545.)  The Court acknowledges that, according to the ALJ, Chambers' counsel represented soon after the hearing that there were no further relevant medical records.  (R. 10.)  But that only deepens the mystery and further warrants inquiring as to what happened after the April 26, 2017 injections.

To the extent that the ALJ's reference to the medical record alluded to the full medical record including treatment and records other than those attributable to Dr. Lefkowitz, the characterization of the record as "unremarkable" is all the more puzzling. As the record shows, despite unremarkable findings from time to time, Chambers had at least twenty-two emergency room visits over a period of two to three years for a variety of ailments, including back pain, shortness of breath, and other afflictions associated with her sarcoidosis.  (*See, e.g.*, R. 46, 294, 312, 323, 338, 344, 357, 385, 392, 405, 427, 443, 467, 613, 623.).  The frequency of such visits is entirely consistent with Dr. Lefkowitz's opinion that Chambers would likely be absent from work "once or twice a month."  (R. 888.)

In sum, the ALJ's determination to assign little weight to Dr. Lefkowitz's opinion is not supported by substantial evidence, and the ALJ erred in her application of the treating physician rule.

For similar reasons, the ALJ's assignment of great weight to the opinions of Dr. Morris and Dr. Titanji is not supported by substantial evidence.  The ALJ's reasoning with respect to both non-treating doctors was as conclusory as that with respect to Dr. Lefkowitz and based on the same underlying errors.  In giving great weight to Dr. Morris' opinion, the ALJ explained that "Dr. Morris personally examined the claimant, and his opinion was consistent with the claimant's conservative treatment and unremarkable clinical record."  (R. 18.)  In giving great weight to Dr. Titanji's opinion, the ALJ merely offered that it "was consistent with the claimant's conservative treatment and activities of daily living."  (R. 19.)  The ALJ thus applied the same faulty reasoning with respect to

"conservative treatment," an "unremarkable clinical record," and "inconsistent" activities of daily living that she applied in assigning Dr. Lefkowitz's opinion little weight.[16]

The ALJ also compounded her errors by mentioning but ignoring the significance of the dates when the three medical source opinions were given.  The two consultative opinions were given in June and September 2015; Dr. Lefkowitz's opinion was given in April 2017.   Bearing in mind that the relevant period considered by the ALJ is September 14, 2014, through March 2018, the ALJ gave great weight to opinions that did not take account of any records or medical events possibly demonstrating Chambers' deterioration over approximately two-and-a-half years of the approximately three-and-a-half year period.[17]   The opinions of Dr. Morris and Dr. Tijanti were stale, and it was error for the ALJ not to account for that.  *See, e.g., Figueroa v. Saul*, No. 18 Civ. 4534, 2019 WL 4740619, at *25-26 (S.D.N.Y. Sept. 27, 2019) (finding error in the ALJ's assigning consultative examining physician's opinion significant weight in part because the doctor's assessment was completed more than two years before the hearing, and the ALJ made no attempt to assess whether claimant's condition had

---

[16] Further, other than referring to the fact that Dr. Morris examined Chambers, the ALJ's decision does not reveal if or to what extent the ALJ considered all the factors required by 20 C.F.R. § 416.927(c)(2)-(6) in her consideration of the weights afforded to the opinions of Dr. Morris and Dr. Titanji.  On remand, the ALJ should expressly address those factors.  And if upon remand the ALJ gives Dr. Lefkowitz's opinion less than controlling weight for good reasons, the ALJ should expressly address the factors in determining what weight to ascribe.  *See, e.g.*, *Ferraro v. Saul*, 806 Fed. App'x 13, 14-16 (2d Cir. 2020) (reversing determination of no disability where, among other missteps, the ALJ did not explicitly consider the frequency, length, nature, and extent of treatment provided).

[17] The declining efficacy of conservative treatment for Chambers' back pain and the lessening of her daily activities, such as no longer cooking for herself, may be indicia of deterioration.  Whether there was deterioration will be for the ALJ to determine.

deteriorated in those two years); *Camille v. Colvin*, 104 F. Supp.3d 329, 343-44 (W.D.N.Y. 2015), aff'd, 652 Fed. App'x 25 (2d Cir. 2016) ("[M]edical source opinions that are 'conclusory, stale, and based on an incomplete medical record' may not be substantial evidence to support an ALJ finding." (quoting *Griffith v. Astrue*, No. 08-CV-6004, 2009 WL 909630, at *9 n.9 (W.D.N.Y. March 31, 2009))); *Jones v. Commissioner of Social Security*, No. 10 CV 5831, 2012 WL 3637450, at *1-2 (E.D.N.Y. Aug. 22, 2012) (ALJ should not have relied on medical opinion in part because it "was 1.5 years stale" as of plaintiff's hearing date and "did not account for her deteriorating condition").

The staleness of the consultative opinions also means that the ALJ erred by giving great weight to Dr. Tinjanti's opinion when he had not reviewed an extensive and material portion of the medical record.  Dr. Tinjanti did not examine Chambers; he merely reviewed the paper record.  But when Dr. Tijanti rendered his opinion, he did not know of Chambers' emergency room visits occurring after September 2015, Dr. Lefkowitz's findings a year-and-a-half later that conservative treatment was not effective, and other aspects of Chambers' medical record during the last quarter of 2015, all of 2016, and into 2017.  *See, e.g.*, *Gunter v. Commissioner of Social Security*, 361 Fed. App'x, 197, 200 (2d Cir. 2010) (summary order) (reversing and remanding where non-examining physician made his assessment without reviewing the claimant's complete medical record and consideration of claimant's entire medical records might have altered the physician's conclusions); *Hidalgo v. Bowen*, 822 F.2d 294, 298 (2d Cir.1987) (holding that Commissioner's evidence was not sufficiently substantial to override the treating physician's assessment of the plaintiff's abilities where consulting

doctor did not review the complete medical record of the plaintiff, which confirmed the treating physician's diagnosis).

And by affording Dr. Lefkowitz's opinion only little weight, the ALJ was left with no medical opinion of any doctor – treating, consulting, or otherwise – to reliably, in the ALJ's view, address more than half of Chambers' relevant disability period.  That left the ALJ to make her own assessments of the medical record in place of those of Chambers' treating doctor, committing yet another legal error.  *Balsamo*, 142 F.3d at 81 ("In the absence of a medical opinion to support the ALJ's finding . . . it is well-settled that 'the ALJ cannot arbitrarily substitute his own judgment for competent medical opinion. . . . While an [ALJ] is free to resolve issues of credibility as to lay testimony or to choose between properly submitted medical opinions, he is not free to set his own expertise against that of a physician who [submitted an opinion to or] testified before him." (alterations in original) (quoting *McBrayer v. Secretary of Health and Human Services*, 712 F.2d 795, 799 (2d Cir. 1983)); *Cora v. Colvin*, 15 Civ. 1549, 2016 WL 4581343, at *2 (S.D.N.Y. Sept. 1, 2016).

The ALJ committed multiple errors in her assessment of the medical source opinions.  These errors are far from academic.  Dr. Lefkowitz's opinion, if deemed controlling, would foreclose Chambers from all light work (because she could stand/walk for only up to two hours and only occasionally lift or carry ten pounds) and possibly even sedentary work (because, as the vocational expert testified, one absence a month would not be tolerated by employers).  Remand is required for proper consideration of the weight to be afforded the opinions of Drs. Lefkowitz, Morris, and Titanji, and whether any additional opinions should be obtained.

**B.     The ALJ Erred in Evaluating Chambers' Complaints About Her Symptoms**

The ALJ found that Chambers' statements about the intensity, persistence, and limiting effects of her symptoms were "not entirely consistent" with the record "because they are not supported by the medical evidence and her testimony and statements about her activities of daily living." (R. 16.)  The same flaws that underlie the ALJ's decision with respect to weighing the medical source opinions apply here, and the ALJ will need to reassess the credibility of Chambers' statements on remand.[18]

## Conclusion

For the reasons stated above, pursuant to sentence four of 42 U.S.C. § 405(g), the Commissioner's motion is DENIED, the Plaintiff's motion is GRANTED, and the case is REMANDED for further proceedings consistent with this opinion.

SO ORDERED,

_____
ROBERT W. LEHRBURGER
UNITED STATES MAGISTRATE JUDGE

Dated:     September 21, 2020
           New York, New York

---

[18] In arriving at her decision, the ALJ made another error, but one that is less consequential than those described above.  The ALJ found that Chambers was capable of performing her past work as a shampooer.  (R. 20.)  At the hearing, however, the vocational expert testified that Chambers would not be able to perform that work due to the chemicals and the limitation on exposure to dust, odors, fumes and gases that the ALJ included in her RFC.  (R. 57.)  Other than being another instance where the ALJ's statement or conclusion cannot be squared with the record, this error does not merit remand because the ALJ expressly based her determination on the alternative grounds that there are other available jobs that Chambers could perform.  (R. 20.)  Of course, on remand, the ALJ will have to newly consider what, if any, jobs are available to Chambers after determining Chambers' RFC consistent with this decision.

Copies transmitted this date to all counsel of record.